*In re* CERTIFIED QUESTION

PREFERRED RISK MUTUAL INSURANCE COMPANY v
MICHIGAN CATASTROPHIC CLAIMS ASSOCIATION

Docket No. 82968. Argued April 4, 1989 (Calendar No. 3). Decided
December 19, 1989.

Preferred Risk Mutual Insurance Company brought an action in
the United States District Court for the Eastern District of
Michigan (Southern Division) against the Michigan Cata-
strophic Claims Association, seeking indemnification for an
amount in excess of $250,000 paid under a policy issued to an
Illinois resident as a result of an accident which occurred in
Michigan. The court, Anna Diggs Taylor, J., granted summary
judgment for the plaintiff. On appeal, the United States Court
of Appeals for the Sixth Circuit certified to the Michigan
Supreme Court the question:

Does the [no-fault act] require the Michigan Cata-
strophic Claims Association to indemnify its member
insurers for losses paid in excess of $250,000 to in-
sureds who are not residents of the State of Michigan
but who were injured as a result of an automobile
accident occurring in the State of Michigan?

In an opinion by Justice BOYLE, joined by Chief Justice RILEY
and Justices BRICKLEY, CAVANAGH, ARCHER, and GRIFFIN, the
Supreme Court *responded:*

The no-fault act does not require the Michigan Catastrophic
Claims Association to indemnify its member insurers for losses
paid to insureds who are not considered residents of Michigan.
The term "residents," however, refers not only to insureds who
actually live within Michigan and who therefore must purchase
no-fault automobile insurance policies written in the state
which provide the compulsory security requirements of MCL
500.3101(1); MSA 24.13101(1) for the owners or registrants of
motor vehicles required to be registered in Michigan, but also
certain insureds who do not live within Michigan but who are

REFERENCES

Am Jur 2d, Automobile Insurance §§ 340 *et seq.*

See Index to Annotations under Automobile Insurance; No-Fault
Insurance.

nonetheless required to register and insure their vehicles in the state.

1. The Catastrophic Claims Association is an organization comprising all insurance companies who write insurance in Michigan which was created by the Legislature to indemnify member insurers for losses sustained as a result of the payment of personal protection insurance benefits beyond the catastrophic level of $250,000 for a single claimant. The association acts as a reinsurer for its member insurers. Section 3104(1) of the no-fault act requires membership in the CCA as a condition of writing insurance in Michigan for all insurers engaged in writing insurance coverages which provide the security required by § 3101(1) within the state. Membership entitles the insurer to indemnification for one hundred percent of the amount of ultimate loss sustained under personal protection insurance coverages in excess of $250,000 for each loss. The association charges each member a premium for the coverage it provides which is based on the number of car years of insurance the member writes in Michigan.

2. Section 3104(2) requires indemnification only when a member has paid benefits in excess of $250,000 under a policy written in Michigan to provide the security required by § 3101(1) for the owner or registrant of a motor vehicle required to be registered in Michigan. When § 3104 is read as a whole, and § 3104(2) is examined in the proper context of the entire section, it becomes clear that the reference to personal protection insurance coverages under which the association may be liable for indemnification in the event of a catastrophic loss is not simply a general reference to all insurance coverages under which an insurer might be required to pay Michigan no-fault benefits. Rather, it is a shorthand reference to the no-fault personal protection insurance coverages that are generally the subject of the act, i.e., those which were written in Michigan to provide the compulsory security requirements of § 3101(1) for the owner or registrant of a motor vehicle required to be registered in this state—residents in the language of the association's plan of operation. In this case, plaintiff did not pay benefits in excess of $250,000 under a policy issued pursuant to § 3101(1) to a resident, but rather paid benefits to a nonresident pursuant to its certification under § 3163.

3. Section 3104(7)(d), in providing the manner and method of calculating and assessing to member insurers the premiums which fund its operation, i.e., on the basis of the total earned car years of insurance written in Michigan providing the security required by § 3101(1), indicates an intent to limit the

association's liability for indemnification under § 3104(2). An insurer not otherwise authorized to write insurance in Michigan, who voluntarily filed the written certification under § 3163(1), subjecting itself and its insureds to the Michigan no-fault system, does not become a member of the association and obviously is not entitled to indemnification under § 3104(2), because it is not engaged in writing any policies under § 3101(1). Likewise, because any benefits paid by an out-of-state insurer authorized to write policies in Michigan to out-of-state insureds are paid by virtue of § 3163(1) certification and not § 3101(1), the Legislature could not have intended to provide indemnification for losses under both types of coverage and yet limit the association's ability to charge premiums for § 3163(1) coverage. There is no inequity in treating an insurer differently depending upon whether it has paid benefits to its out-of-state insureds pursuant to its certification under § 3163 or pursuant to a policy of insurance written in Michigan for a vehicle registered in Michigan. While the language of § 3104(2) states only that indemnification is to be provided where catastrophic losses are sustained under "personal protection insurance coverages," the Legislature clearly intended the phrase to refer only to those coverages written in Michigan for the owners and registrants of vehicles required to be registered in Michigan. It cannot be concluded that the Legislature intended the association to be liable on policies of insurance for which it has not charged, and in fact cannot charge, its members premiums. Thus, the association has correctly interpreted § 3104(2) to apply only to personal protection insurance coverages written for "residents" of Michigan, who, as that term is intended under the association's plan of operation, include not only those insureds who actually live within the state, but also out-of-state residents who have purchased such coverages in Michigan as a result of the compulsory security requirements of § 3101(1).

Justice LEVIN, writing separately, stated that there is a substantial question whether the Court has jurisdiction to respond to a certified question.

INSURANCE — NO-FAULT — CATASTROPHIC CLAIMS — INDEMNIFICATION.

The no-fault act does not require the Michigan Catastrophic Claims Association to indemnify its member insurers for losses paid to insureds who are not considered residents of Michigan; the term "residents," however, refers not only to insureds who actually live within Michigan and who therefore must purchase no-fault automobile insurance policies written in the state which provide the compulsory security requirements of MCL

500.3101(1); MSA 24.13101(1) for the owners or registrants of motor vehicles required to be registered in Michigan, but also certain insureds who do not live within Michigan but who are nonetheless required to register and insure their vehicles in the state.

*Franklin, Bigler, Berry & Johnston, P.C.* (by *Steven C. Berry* and *James L. Borin*), for the plaintiff.

*Dykema Gossett* (by *Donald S. Young, Kathleen McCree Lewis, Marybeth Targett Collon,* and *Ronald J. Torbert*) for the defendant.

Amici Curiae:

*Garan, Lucow, Miller, Seward, Cooper & Becker, P.C.* (by *James L. Borin* and *Ann M. Cisco*), for Auto-Owners Insurance Company, Continental Insurance Company, and Hanover Mutual Insurance Company.

BOYLE, J. The United States Court of Appeals for the Sixth Circuit has certified, pursuant to MCR 7.305(B), the following question to this Court:

> Does the Motor Vehicle Personal and Property Protection Act, Mich Comp Laws Ann §§ 500.3101-[500].3179 [MSA 24.13101-24.13179], require the Michigan Catastrophic Claims Association to indemnify member insurers for losses paid in excess of $250,000 to insureds who are not residents of the State of Michigan but who were injured as a result of an automobile accident occurring in the State of Michigan?

We have accepted the certification,[1] and now hold that the no-fault act does not require the Michigan Catastrophic Claims Association (CCA) to indemnify

[1] See 431 Mich 1206 (1988).

its member insurers for losses paid to insureds who are not considered residents of this state. We note, however, that in the context of this question as certified, we understand the term "resident" to refer not only to those insureds who actually live within this state and who must therefore purchase no-fault automobile insurance policies written in this state which provide the compulsory security requirements of MCL 500.3101(1); MSA 24.13101(1) for the owners or registrants of motor vehicles required to be registered in this state, but also to certain insureds who do not live within this state but who are nonetheless required to register, and thus insure, their vehicles in this state.

I

The CCA is an organization comprising all insurance companies who write insurance in this state. It was created by the Legislature in 1978 in response to concerns that Michigan's no-fault law provision for unlimited personal injury protection benefits placed too great a burden on insurers, particularly small insurers, in the event of "catastrophic" injury claims.[2] Its primary purpose is to

---

[2] The Legislature recognized that while such claims might be rare, they are also unpredictable, and equally as likely to strike a small or medium-sized insurer as they are a large insurer. The obvious problem is that the small or medium-sized companies have substantially fewer cars over which to spread the costs of potential losses, which means that the costs of providing unlimited medical and other benefits is higher per car for such companies, putting them at a competitive disadvantage in the state's insurance market. In addition to this competitive disadvantage, the Legislature considered the practical "business difficulties" confronting all insurers as a result of such possible catastrophic claims, such as the difficulty in determining the amount of reserves to keep on hand.

It was thought that the creation of such an association of insurers would alleviate the competitive inequity of these catastrophic claims by spreading their cost throughout the industry, and also increase the statistical basis for prediction of the overall cost of such claims, making the management of these liabilities easier. See House Legislative Analysis, SB 306, March 13, 1978.

indemnify member insurers for losses sustained as a result of the payment of personal protection insurance benefits beyond the "catastrophic" level, which has been set at $250,000 for a single claimant. MCL 500.3104; MSA 24.13104 governs its operation.

In practice, the CCA acts as a kind of "reinsurer" for its member insurers. Initially, § 3104(1) requires membership in the CCA as a condition of authority to write insurance in this state for all insurers "engaged in writing insurance coverages which provide the security required by section 3101(1) within this state . . . ."[3] Membership in the CCA entitles the insurer to indemnification for certain losses under § 3104(2), which provides in full:

> The association shall provide and each member shall accept indemnification for 100% of the amount of ultimate loss sustained under personal protection insurance coverages in excess of $250,000.00 in each loss occurrence. As used in this section, "ultimate loss" means the actual loss

[3] MCL 500.3101(1); MSA 24.13101(1) requires:

The owner or registrant of a motor vehicle *required to be registered in this state* shall maintain security for payment of benefits under personal protection insurance, property protection insurance, and residual liability insurance. Security shall be in effect continuously during the period of registration of the motor vehicle. [Emphasis added.]

Section 3104(1) also requires membership in the CCA for those insurers who write coverages providing "the security required by section 3103(1) within this state . . . ." MCL 500.3103(1); MSA 24.13103(1) requires third-party insurance coverage for motorcycles. Under § 3101(2)(c), however, motorcycles are not considered motor vehicles for purposes of the no-fault act, and thus such insurers are deemed members of the association "only for purposes of [premium] assessments under subsection (7)(d)." They are not entitled to indemnification for losses sustained, but must still pay into the association's operating fund. Our discussion of the rights of member insurers to indemnification, therefore, is limited to the rights of those insurers providing security for motor vehicles.

amounts which a member is obligated to pay and which are paid or payable by the member, and shall not include claim expenses. An ultimate loss is incurred by the association on the date which the loss occurs.[4]

Like any insurer, the CCA charges each of its members a premium for the coverage it provides, which is based on the number of car years of insurance the member writes in Michigan.[5]

In this case, plaintiff Preferred Risk paid Michigan no-fault benefits in excess of $250,000 to an Illinois resident whom it had insured under a policy written in that state, but who was injured in an automobile accident in Michigan. Plaintiff's insured was a passenger in a car owned and insured by a Michigan resident.

Plaintiff's liability for such benefits is not contested here. The parties agree that § 3163(1) of the no-fault act required plaintiff, as an insurer authorized to write insurance in this state, to provide Michigan no-fault benefits to its insured in the event that he traveled to Michigan and was injured in an automobile accident.[6] The parties

---

[4] The CCA's provision of indemnification, and the insurer's acceptance of such indemnification, is obligatory. In order to ensure an adequate pool of funds to cover such claims, members are prohibited under this section from spreading the risk of catastrophic claims to private reinsurers or self-insuring against such risk.

[5] Under § 3104(7)(d), the CCA first calculates the amount it will need to cover its expected losses and expenses during the applicable period, its "total premium," and then charges the member insurers individual premiums based on their respective shares of the state's auto insurance market. The act also expressly provides that the member insurer may pass the amount of its premium assessment on to its policyholders. MCL 500.3104(22); MSA 24.13104(22).

[6] MCL 500.3163(1); MSA 24.13163(1) provides:

An insurer authorized to transact automobile liability insurance and personal and property protection insurance in this state shall file and maintain a written certification that any accidental bodily injury or property damage occurring in this

also agree that § 3114(1) of the no-fault act, which requires that the insured first seek personal protection benefits from his own insurer, established plaintiff as the primary insurer in this case.

There is also no question that at the time of this claim plaintiff was a member insurer of the CCA. A member need not write all of its automobile liability insurance in this state, although some do, and while it also wrote insurance coverages in other states, plaintiff was clearly "engaged in writing insurance coverages which provide the security required by section 3101(1) within this state."[7]

Plaintiff eventually paid over $340,000 in personal injury protection benefits to the claimant in this case. It applied to the CCA for indemnification for the amount over $250,000, reasoning that while it had provided insurance coverage to an Illinois resident, for an Illinois-registered vehicle, it had paid Michigan no-fault benefits, which should be reimbursable under § 3104(2). The CCA denied plaintiff's application, however, claiming that under its plan of operation[8] reimbursement

state arising from the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle by an out-of-state resident who is insured under its automobile liability insurance policies, shall be subject to the personal and property protection insurance system set forth in this act.

[7] For example, in 1982 Preferred Risk wrote over 13,000 car years of insurance in Michigan alone. See Affidavit of Edward Machowski, General Manager and Claims Administrator of the Catastrophic Claims Association, dated October 31, 1986.

[8] MCL 500.3104(17); MSA 24.13104(17) provides:

Not more than 60 days after the initial organizational meeting of the board, the board shall submit to the commissioner for approval a proposed plan of operation consistent with the objectives and provisions of this section, which shall provide for the economical, fair, and nondiscriminatory administration of the association and for the prompt and efficient provision of indemnity.

was limited to losses paid out "under policies of insurance issued to residents of the State of Michigan . . . ."[9]

Following the denial of its claim by the CCA, plaintiff instituted the present action in the United States District Court for the Eastern District of Michigan (Southern Division). Both parties moved for summary judgment. Plaintiff claimed that since it was a member insurer who had paid benefits under the Michigan no-fault system in excess of $250,000, the CCA was obligated under § 3104(2) to provide it with "indemnification for 100% of the amount of ultimate loss" it had sustained over that amount, regardless of the nonresident status of its insured, and it was required to accept such indemnification. The "resident only" requirement imposed by the CCA in its plan of operation, plaintiff argued, conflicted with the language and purpose of § 3104, and was beyond the CCA's authority to impose.

The CCA argued in response that its plan of operation, including its limitation of indemnification to coverages written for residents of this state, was a valid interpretation of § 3104. Specifically, the CCA claimed that the Legislature had left it up to the association to determine, through its plan of operation, which particular policies were subject to indemnification under § 3104, and that its limitation of indemnification to policies written for residents was in any event consistent with § 3104(7)(d), which allows it to charge premiums only on the basis of insurance coverages written in this state.

The district court granted summary judgment in favor of Preferred Risk. The association appealed

[9] See 1982 Michigan Catastrophic Claims Association, Plan of Operation, Article IV, entitled "Definitions," § 4.01(g), defining "Reimbursable Ultimate Loss." See also Article II, § 2.01, and Article IV, § 4.01(d), also limiting indemnification to losses under "policies of insurance issued to residents of the State of Michigan . . . ."

in the United States Court of Appeals for the Sixth Circuit which, after oral argument, granted its motion to certify the question to this Court. The question as certified asks whether the CCA must indemnify its member insurers for losses suffered over $250,000 under policies issued to insureds who are not "residents" of this state but who were injured here.

II

We believe that the CCA has properly interpreted the indemnification requirement of § 3104(2). For the reasons set forth below, we conclude that § 3104(2) requires indemnification only when the member insurer has paid benefits in excess of $250,000 under a policy which was written in this state to provide the security required by § 3101(1) of the no-fault act for the "owner or registrant of a motor vehicle required to be registered in this state . . . ." The CCA, whose policy of restricting indemnification to "residents of this state" is the subject of this dispute, has acknowledged that for purposes of indemnification under § 3104(2) it considers all owners or registrants of motor vehicles required to be registered here to be "resident[s] of the State for purposes of the Act," regardless of whether they actually live within this state.[10] With

[10] In its supplemental brief on appeal, the CCA acknowledges that there are situations in which persons who do not actually live within this state are nonetheless required to register and insure their vehicles in this state. See, e.g., MCL 257.243(b)-(d); MSA 9.1943(b)-(d). In such cases, the CCA concedes, these insureds are "deemed to be" residents of this state by virtue of their purchase of compulsory insurance coverage in this state pursuant to § 3101(1):

In assessing the validity of the Michigan-only restriction, the Association urges the Court to focus not on the physical location of the owner/registrant of the motor vehicle, but on whether or not the vehicle is required, because of the state of registration, to maintain security for the payment of Michigan

this acknowledgment in mind, we must conclude, in answering the question as certified, that the CCA is required to indemnify member insurers only for losses paid to "residents" of this state.

We wish, however, to emphasize that the analysis which follows in support of this conclusion is based solely upon our interpretation of the Catastrophic Claims Act itself. In particular, we emphasize that our analysis does not rest upon any finding by this Court that the association's plan of operation constitutes a "reasonable interpretation" of § 3104 in light of the Legislature's deference to its expertise in this area. In our opinion, the Legislature did not leave it up to the CCA to decide who will receive indemnification. As plaintiff aptly argues, the requirement in § 3104(2) that the CCA "shall provide" indemnification for losses in excess of $250,000 can hardly be called deferential. Thus, while we agree with the CCA's interpretation of § 3104(2)'s indemnification requirement, we do so on the basis of the language of the statute itself.[11]

PIP benefits. If the owner or registrant is required to maintain such security, the insurer of the motor vehicle has paid an assessment to the Association on that policy. Indemnification for incurred no-fault losses in excess of $250,000 under the policy is proper. *The owner or registrant, even though physically located outside Michigan, appropriately is deemed a resident of the State for purposes of the Act.* [Emphasis added.]

[11] Our conclusion that it is the statute itself which controls this question precludes us from addressing, or relieves us from having to address, most of the various questions raised regarding the CCA's plan of operation. We do not discuss, for example, plaintiff's claim that the restriction violated the CCA's obligation to provide an economical, fair and nondiscriminatory plan of operation under § 3104(17). We also need not address the question whether the CCA's plan of operation was properly promulgated under the Administrative Procedures Act, MCL 24.201 *et seq.*; MSA 3.560(101) *et seq.*, which issue we have taken up in *League General Ins Co v Michigan Catastrophic Claims Ass'n*, lv gtd 431 Mich 870 (1988).

Moreover, we do not express any opinion as to whether the CCA would be obligated to provide indemnification to an insurer who has written a policy in this state for a nonresident pursuant to § 3102(1).

A

The question before the Court essentially asks on which coverages will the CCA be liable for indemnification in the event of a catastrophic loss. The answer to that question lies, of course, within § 3104(2), which again provides in relevant part:

The association shall provide and each member shall accept indemnification for 100% of the amount of ultimate loss sustained under personal protection insurance coverages in excess of $250,000.00 in each loss occurrence.

Plaintiff contends that the phrase "personal protection insurance coverages" in § 3104(2) refers generally to any coverages under which it may be required to pay Michigan no-fault benefits, regardless of where or for whom written. According to plaintiff, once it had established that it was a member of the association and that it had sustained a loss under a "personal protection insurance coverage" in excess of $250,000, the language of § 3104(2) "clearly and unambiguously" obligated the CCA to reimburse it for that loss.

It is axiomatic, as plaintiff states, that this Court must enforce "clear and unambiguous" statutory provisions as written. *Owendale-Gagetown School Dist v Bd of Ed,* 413 Mich 1, 8; 317 NW2d 529 (1982); *Dussia v Monroe Co Employees Retirement System,* 386 Mich 244; 191 NW2d 307 (1971). This rule of statutory construction must be applied, however, with the understanding that "[w]hat is 'plain and unambiguous' often depends on one's frame of reference." *Shiffer v Gibraltar School Bd*

MCL 500.3303(b); MSA 24.13303(b) appears to indicate that nonresidents who intend to reside in this state for thirty days or more are entitled to purchase insurance in this state upon making a written statement of such intention.

*of Ed,* 393 Mich 190, 194; 224 NW2d 255 (1974). That frame of reference is supplied, in most cases, by the entire act of which the provision to be interpreted and applied is only a part. As this Court has often observed "[a] statute must be read in its entirety and the meaning given to one section arrived at after due consideration of other sections so as to produce, if possible, an harmonious and consistent enactment as a whole." *State Treasurer v Wilson,* 423 Mich 138, 145; 377 NW2d 703 (1985). See also *Williams v Secretary of State,* 338 Mich 202, 207; 60 NW2d 910 (1953).

The fundamental purpose of any rule of statutory construction, of course, is to assist the court in discovering and giving effect to the intent of the Legislature. It is thus equally axiomatic that " 'the intention of the Legislature, when discovered, must prevail, any existing rule of construction to the contrary.' " *Metropolitan Council No 23 v Oakland Co Prosecutor,* 409 Mich 299, 318-319; 294 NW2d 578 (1980), quoting *Michigan Central R Co v Michigan,* 148 Mich 151, 156; 111 NW 735 (1907). As Justice WILLIAMS elaborated in *Metropolitan Council No 23:*

> Neither clinical construction nor the letter of the statute nor its rhetorical framework should be permitted to defeat the act's purpose and intent as gathered from consideration of the whole act. As eloquently stated by Justice GRANT in *Common Council of Detroit v Rush,* 82 Mich 532, 542; 46 NW 951 (1890): "[A] thing which is within the spirit of a statute is within the statute, although not within the letter; and a thing within the letter is not within the statute, unless within the intention." This principle was more recently stated in *Aikens v Dep't of Conservation,* 387 Mich 495, 499; 198 NW2d 304 (1972): "It is well settled that the proper construction of any statute is for the court. The purpose of the court in interpreting a statute

is to give effect to the legislative intent. If there is a conflict, the spirit and purpose of the statute should prevail over its strict letter." (Citations omitted.) [*Id.,* p 319.]

Ultimately, " '[t]he particular inquiry is not what is the abstract force of the words or what they may comprehend, but in what sense were they intended to be understood or what understanding do they convey as used in the particular act.' " *People v Lynch,* 410 Mich 343, 354; 301 NW2d 796 (1981), quoting 2A Sands, Sutherland Statutory Construction (4th ed), § 46.07, p 110.

In our opinion, when § 3104 is read as a whole, and § 3104(2) is examined in the proper context of the entire section, it becomes clear that the reference to "personal protection insurance coverages" under which the CCA may be liable for indemnification in the event of a catastrophic loss is not simply a general reference to all insurance coverages under which an insurer might be required to pay Michigan no-fault benefits. Rather, it is a shorthand reference to the no-fault personal protection insurance coverages that are generally the subject of the act, i.e., those which were written in this state to provide the compulsory security requirements of § 3101(1) of the no-fault act for the "owner or registrant of a motor vehicle required to be registered in this state"—"residents," in the language of the CCA's plan of operation.[12] In this case, plaintiff did not pay benefits in excess of $250,000 under a policy issued pursuant to § 3101(1) to a "resident," but rather paid benefits to a nonresident pursuant to its certification under § 3163.

---

[12] As we stated in *Elba Twp v Gratiot Co,* 287 Mich 372, 394; 283 NW 615 (1939), "[i]n ascertaining the true intent and meaning of a statute often allowance must be made for attempted brevity of expression."

B

In reaching this conclusion, we note initially that the only other reference in § 3104 to "insurance coverages" is found in § 3104(1), which makes membership in the association mandatory for each insurer "engaged in writing insurance coverages which provide the security required by section 3101(1)." Section 3101(1), again, requires only the owner or registrant of a motor vehicle "required to be registered in this state" to maintain personal protection, property protection, and residual liability insurance on the vehicle.[13] By its terms, § 3101(1) does not apply to vehicles that are not required to be registered in Michigan. See *Parks v DAIIE,* 426 Mich 191; 393 NW2d 833 (1986).[14]

It is upon § 3104(7)(d), however, that we squarely rest our finding of a legislative intent to limit indemnification under § 3104(2). Section 3104(7)(d) provides the manner and method in which the CCA is to calculate and assess to member insurers the premiums which fund its operation. Under that section, the CCA first arrives at a figure which represents its expected losses and costs for the assessment period. This "total premium" is divided by the total earned car years of insurance "providing the security required by section 3101(1) . . . written in this state" by all insurers to arrive at an average premium per car. The average premium is then multiplied by each member's total earned car years of insurance "providing the security required by section 3101(1) . . . written in this

[13] See n 3 for the full text of this section.

[14] We also note the language of § 3104(3), which provides that "[a]n insurer may withdraw from the association only upon ceasing to write insurance which provides the security required by section 3101(1) in this state."

state" to arrive at that member's total premium for the assessment period.[15]

In our view, the fact that the Legislature granted the CCA the authority to charge premiums only with respect to policies written in Michigan providing the security required by § 3101(1) for the owners or registrants of vehicles required to be registered in the state, compels the conclusion that it intended to similarly limit the CCA's liability for indemnification under § 3104(2). Put simply, we can think of no reason why the Legislature would want to provide such indemnification coverage to insurers, even member insurers who do a significant amount of business within this state, absolutely free of charge or, perhaps more appropriately, at no cost *to them.*

The language of § 3104(7)(d) confirms initially the clear purpose behind the creation of the CCA to reduce, in *this state's* insurance market, both the inequity of competition resulting from the unpre-

---

[15] Section 3104(7)(d) provides that the association shall

[i]n a manner provided for in the plan of operation, calculate and charge to members of the association a total premium sufficient to cover the expected losses and expenses of the association which the association will likely incur during the period for which the premium is applicable. The premium shall include an amount to cover incurred but not reported losses for the period and may be adjusted for any excess or deficient premiums from previous periods. Excesses or deficiencies from previous periods may be fully adjusted in a single period or may be adjusted over several periods in a manner provided for in the plan of operation. Each member shall be charged an amount equal to that member's *total earned car years of insurance providing the security required by section 3101(1) or* 3103(1), or both, *written in this state* during the period to which the premium applies, multiplied by the average premium per car. The average premium per car shall be the total premium calculated divided by the total earned car years of insurance *providing the security required by section 3101(1) or* 3103(1) *written in this state* of all members during the period to which the premium applies. As used in this subdivision, "car" includes a motorcycle. [Emphasis added.]

dictability of catastrophic claims and the inherent inability of insurance companies, both large and small, to effectively manage this particular kind of liability. Thus, it is important to realize that any benefits paid by an insurer such as plaintiff to its out-of-state insureds are paid by virtue of the certification filed pursuant to § 3163(1), under a policy actually written and sold in another state's insurance market, rather than by virtue of a policy providing the security required by § 3101(1) written and sold in this state's insurance market. We simply cannot believe that the Legislature could have intended to provide indemnification for losses under both kinds of coverage and yet deny the CCA the ability to charge premiums with respect to the former.[16]

We find unpersuasive plaintiff's proffered rationale that since § 3163(1) subjects the insurers of nonresidents (if they write coverages in Michigan) to liability under the Michigan no-fault system, including its open-ended personal protection benefits provisions, they likewise should be entitled to all of its protections. Clearly, as to those out-of-state insureds, such insurers have not paid for this particular protection. This conclusion is perhaps best illustrated by reference to another provision of § 3163.

---

[16] Although we recognize that such sources are of limited value, and are clearly not dispositive of legislative intent, we do find some measure of support for our reading of § 3104(2) in this case in the language of two different legislative analyses of § 3104. The House Legislative Analysis of SB 306, *ante,* n 2, notes that the cost of catastrophic coverages would be spread among the CCA's members, "[a]ll auto insurers *in the state,*" who would be billed according to their respective shares of the auto insurance market so that "in practice, each policyholder in the state would be paying the same amount . . . for unlimited PIP coverage."

The Department of Commerce Analysis of SB 306 similarly notes the favorable effect of "equitable distribution of catastrophic claims among all of the state's motorists," and also points out that the cost of providing such coverage would be "predictable," since the "base of cars would be all insured cars in Michigan."

Under § 3163(2), an insurer not otherwise authorized to write insurance coverages in this state may voluntarily file the written certification described in § 3163(1) similarly subjecting itself and its insureds to the Michigan no-fault system. Although such voluntary filing is perhaps not a frequent occurrence, neither is it unheard of. See, e.g., *Kriko v Allstate Ins Co of Canada,* 137 Mich App 528; 357 NW2d 882 (1984).[17] An insurer who so files under § 3163(2) does not become a member of the CCA, since it is not engaged in writing any policies under § 3101(1). It is thus obviously not entitled to indemnification under § 3104(2).

As a practical matter, however, it would make little sense to provide such an insurer with the protection of § 3104, even though it had paid Michigan no-fault benefits, since the insurer who has paid benefits pursuant to § 3163(2) has not paid any kind of premium to the CCA for such protection. The same reasoning must certainly apply to the plaintiff insurer who is required to provide benefits under § 3163(1) because it is authorized to write policies in Michigan. As to its out-of-state insureds, whatever percentage of its business they make up, the plaintiff simply has not paid for the protection of § 3104.

Plaintiff's general assertion that its liability under § 3163 entitled it to "all of the rights and immunities under the Michigan no-fault law irrespective of" the nonresident status of its insured, including the right of catastrophic loss protection under § 3104, is simply unfounded. As defendant

---

[17] In *Kriko,* the defendant, a Canadian insurance company, apparently "sought to make its insurance policies more attractive to potential customers who might be regular travellers in the State of Michigan and/or sought to avail itself of the potential benefits provided by Michigan's no-fault system by filing its certification." *Id.,* p 532.

CCA points out, § 3163(3) states that the insurer and insured shall have the rights and immunities of "personal and property protection *insureds*." (Emphasis added.) Section 3104 is not intended to protect or benefit no-fault insureds. The rights and benefits it establishes flow only to insurers.

Moreover, even if we were to conclude that § 3163(3) generally provides insurers who file the proper certification with all the rights of an insurer who has written a policy pursuant to § 3101(1)—a question not before this Court—we would still be unable to find a right to indemnification in this case. It is § 3104 itself which limits the right to indemnification to insurers who have provided coverages pursuant to § 3101(1). As a specific and subsequently enacted provision § 3104 must control as against the more general § 3163(3). Thus, the "system" of which plaintiff contends it is a part as a result of its certification under § 3163(1) does not in fact establish plaintiff's right to indemnification.

We must remember that insurers such as plaintiff ran the risk of exposure to such catastrophic claims as a result of § 3163 long before the CCA was created. Plaintiff in this case did not gain additional exposure as a result of the creation of the CCA. Moreover, to the extent that the liability of the CCA is limited to policies of insurance written in this state for Michigan-registered vehicles, insurers such as plaintiff remain free to seek reinsurance elsewhere or act otherwise to limit that risk. Plaintiff's argument that it thought it was somehow "precluded" from seeking reinsurance elsewhere for its out-of-state insureds by the "shall accept" language of § 3104(2) is without merit. The association's plan of operation quite clearly explained that the indemnification was to be provided only for policies written for Michigan

residents. Plaintiff was therefore not justified in believing that it was precluded from seeking, and accepting, other reinsurance with respect to its nonresident insureds.

Finally, our conclusion that the Legislature did not intend to confer such a substantial benefit upon such insurers is confirmed by our view that it did not intend to impose so substantial a burden upon those who would be ultimately liable for the cost of such coverage, that is, this state's no-fault insurance consumers, to whom any and all costs of such indemnification coverage inevitably would be passed. Under plaintiff's reading of the statute, these insureds would be required to cover not only the costs of the claims made by their fellow Michigan insureds, who, it must be remembered, have also actually contributed to the fund through passed-on premiums, but also the costs of the claims of insureds from other states, who have not paid into the fund in the same manner. Plaintiff's reading of the statute would thus undoubtedly have a great effect on the cost to consumers of buying insurance in Michigan. Quite obviously, if the CCA were required to take into account the possible claims of nonresidents in arriving at its total premium, the average premium per car, which, again, is passed on only to resident insureds, would necessarily be higher.[18]

In sum, unlike plaintiff, we see no inequity in

[18] Lastly, we reject the argument advanced by amici curiae that to deny indemnification coverage for policies issued to out-of-state insureds or for nonregistered vehicles violates the insurers' equal protection rights. As we have stated many times before, the test for an equal protection claim under both the Michigan and the United States Constitutions is whether the legislation bears a reasonable relationship to a legitimate goal of the Legislature. See, e.g., *Automatic Music & Vending Corp v Liquor Control Comm,* 426 Mich 452, 459; 396 NW2d 204 (1986); *Shavers v Attorney General,* 402 Mich 554; 267 NW2d 72 (1978).

In our opinion, providing coverage for policies written in this state for vehicles registered in this state quite clearly advances the goals of

treating an insurer differently depending upon whether it has paid benefits to its out-of-state insureds pursuant to its certification under § 3163 or pursuant to a policy of insurance written in this state for a vehicle registered here. While the language of § 3104(2) does state only that indemnification shall be provided where catastrophic losses are sustained under "personal protection insurance coverages," we believe that the Legislature clearly intended that phrase to refer only to such coverages as are written in this state for the owners and registrants of vehicles required to be registered here. Again, we are simply unable to conclude that the Legislature intended the CCA to be liable on policies of insurance for which it has not charged, and in fact cannot charge, its members premiums.

III

The United States Court of Appeals for the Sixth Circuit has asked this Court to consider whether the Michigan Catastrophic Claims Association's obligation under § 3104(2) of the no-fault act to indemnify member insurers for losses incurred over $250,000 for personal protection benefits applies where such benefits are paid to a nonresident pursuant to § 3163.

We answer that the CCA has correctly interpreted § 3104(2) to apply only to personal protection insurance coverages written for "residents" of this state, who, as that term is intended under the CCA's plan of operation, include not only those

_____

the Legislature with respect to ensuring fair competition within *this state's* no-fault insurance market. We do not believe that a scheme which limits indemnification coverage to those who have paid for it is irrational or arbitrary. Nor do we believe that the state must offer such coverage to all insurers with respect to their out-of-state insureds.

insureds who actually live within the state, but also out-of-state residents who have purchased such coverages in this state as a result of the compulsory security requirements of § 3101(1).

RILEY, C.J., and BRICKLEY, CAVANAGH, ARCHER, and GRIFFIN, JJ., concurred with BOYLE, J.

LEVIN, J. (*separate opinion*). I am in substantial agreement with the conclusion and the views stated in the majority opinion.

I write separately to indicate my continued adherence to the view expressed in *In re Certified Question (Bankey v Storer Broadcasting Co)*, 432 Mich 438, 458; 443 NW2d 112 (1989), that there is a substantial question whether the Court has jurisdiction to respond to a certified question.